UNITED STATES
DISTRICT OF MINNESOTA
Criminal No. 20-CR-282 (PAM/ECW)

_____

UNITED STATES OF AMERICA,

     Plaintiff,

v.

Leroy Lemonte Perry Williams, Jr.,

     Defendant.

**DEFENDANT LEROY LEMONTE
PERRY WILLIAMS'
POSITION REGARDING
SENTENCING**

_____

## BACKGROUND

On August 26, 2020, during a night of civil unrest, approximately 72 businesses in downtown Minneapolis were damaged through acts of looting, rioting and arson. *(PSR, ¶18).* The catalyst for this behavior was the murder of E.G. in a parking ramp earlier that day. *(PSR, ¶17).* Minneapolis police identified a suspect who committed suicide as Minneapolis officers approached to make an arrest. *(PSR, ¶17).* This led to an unfounded rumor that police had somehow caused the suspect's death, arousing an angry crowd to gather in downtown Minneapolis. *(PSR, ¶18).* Ironically, E.G. was a mentor and stepfather figure to the Defendant.

The Target Headquarters building was among those damaged that evening. *(PSR, ¶23).* Target Headquarters sustained substantial damage due to a fire set in a mailroom. *(PSR, ¶¶23, 25).* A police investigation quickly determined the fire had been set by Shador Tommie Cortez Jackson ("Jackson") and Victor Devon Edwards ("Edwards"). *(PSR, ¶¶23, 26, 27).* The Bureau of Alcohol, Tobacco and Firearms ("ATF") issued a press release on September 24, 2020 seeking public assistance in identifying other individuals police feel acted in concert with Edwards and Jackson. This press release included a photograph of Leroy Lemonte Perry

1

Williams, Jr. ("Williams" or "Defendant") obtained from Target surveillance cameras recording events on August 26. A short time later, Heather Henning ("Henning"), a Target loss prevention team member and security employee, identified Williams as a potential suspect. *(PSR, ¶28).* Henning told law enforcement officials that she had repeatedly encountered Williams as a frequent trespasser at the Nicollet Mall Target store. *(PSR, ¶28).* This identification led to Williams' arrest on November 19, 2020. *(PSR, ¶12).* Shortly afterward, on December 10, 2020, a one-count Indictment was filed in U.S. District Court for Minnesota charging Jackson, Edwards and Williams with conspiracy to commit arson in violation of 18 U.S.C. §844(i).

Williams was initially represented by Matthew Mankey ("Mankey"). Williams was granted pretrial release on a personal recognizance bond following his indictment. *(PSR, ¶12).* Later, in January 2021, Williams was ordered detained but was quickly furloughed to Minnesota Adult and Teen Challenge (MNTC) on February 3, 2021. Williams began receiving programming at MNTC on February 10, 2021 and successfully completed the MNTC short-term treatment program on May 7, 2021. *(PSR, ¶12).* These events all occurred in conjunction with a change of plea arranged by the Defendant's former attorney.

On January 21, 2021, a two-count Superseding Indictment was filed charging Jackson, Edwards and Williams with conspiracy to commit arson in violation of 18 U.S.C. §844(i) and charging Edwards, in a second count, with arson in violation of 18 U.S.C. §844(i). Williams appeared on January 25, 2021 and, without a written plea agreement, plead guilty to Count 1 (conspiracy to commit arson) of the Superseding Indictment. *(PSR, ¶4).* The impetus for this plea was Williams' fervent desire to be released from custody coupled with his attorney's belief that Williams would profit from chemical dependency treatment. Judge Schiltz apparently agreed which resulted in the furlough to MNTC. *(PSR, ¶12).*

Initially, Williams' treatment went well. He completed the MNTC short-term program on May 7, 2021. The Defendant was then transitioned to MNTC's long-term treatment program. *(PSR, ¶12).* By September 2021, Williams' ongoing participation in MNTC was in peril. On September 1, the Defendant submitted a substance use test at MNTC which produced positive results for alcohol and cocaine. *(PSR, ¶13).* In late summer 2021, Williams discovered that his relative, Knautica Beamon ("Beamon")[1] was seriously ill and on life support as the result of an auto accident. Williams sought a pass to visit Beamon in the hospital as her family considered end of life treatment options. Williams' request was denied which he felt violated an understanding between the Defendant and MNTC staff. Accordingly, the Defendant left the program to visit Beamon and her family in the hospital. *(PSR, ¶35).*

Williams acknowledged that he did not have permission to leave the facility. At the same time, Williams denies this constitutes absconding as it is characterized in the Presentence Report (PSR). The Defendant noted that he immediately informed his attorney of his actions. Williams also believed, as a consequence of an Order issued on May 6 when the Defendant was transferred to long-term care, that Williams was no longer in custody of the government. The Defendant asserts that he did not promptly surrender to authorities because he was confused about his custody status and did not understand there may have been self-surrender options which could have mitigated the consequences of his impulsive decision. Williams was eventually arrested on July 19, 2022 in Gary, Indiana and returned to Minnesota. *(PSR, ¶13).*[2]

After returning to Minnesota, Defendant regretted his earlier decision to plead guilty and requested a new attorney. On March 8, 2023, Judge Schiltz granted Williams' request to vacate

---

[1] Beamon and the Defendant were relatives. The PSR identified her as the Defendant's sister, although Beamon may have been a stepsister. *(PSR, ¶35).*

[2] The Indiana charges which resulted in Williams' arrest were dismissed in May 2023. *(PSR, ¶13).*

his guilty plea. *(PSR, ¶7).* The Judge expressed some skepticism during the hearing regarding the measure of proof presented by the government of a conspiracy between Williams and his co-defendants. A short time later, on March 28, 2023, a Second Superseding Indictment was issued charging Williams with an arson offense in violation of 18 U.S.C. §844(i). This matter was reassigned to Judge Magnuson on September 12, 2023 and Defendant was tried between October 24-26, 2023 when a jury convicted Williams of attempted arson. *(PSR, ¶10).* This matter is now before the Court for sentencing.

## ANALYSIS

### I.      THE GUIDELINE SENTENCE.

Following the Defendant's conviction, the Court ordered preparation of a PSR. This document was completed and filed with the Court on January 11, 2024.

#### A.      PSR guideline calculations.

The PSR determined the base offense level (BOL) for Defendant's attempted arson conviction under 18 U.S.C. §844(i) to be 24 in accordance with U.S.S.G. §2K1.4. Pivotal to the designation of this BOL was the probation officer's belief that the Target Headquarters was a place of public use at the time of the offense. The PSR also recommended a two-level enhancement for obstruction of justice as allowed by U.S.S.G. §3C1.1, resulting in a total adjusted offense level of 26. The PSR recommended that Williams receive no reduction in his offense level for acceptance of responsibility, resulting in a total offense level, for sentencing, of 26 (24 + 2 = 26). The PSR also concluded that Williams had a total criminal history score of 17 but reduced the Defendant's criminal history score to 13 as only a maximum of four single-point offenses can be counted toward Defendant's criminal history score calculation under U.S.S.G. §4A1.1(c). *(PSR, ¶76).* This placed the Defendant in criminal history category VI. Based on the

Defendant's criminal history category and the total offense level of 26, the PSR concluded the guideline imprisonment range to be 120-150 months.[3]

### B.   Defendant's position regarding appropriate guideline calculation.

The Defendant raised multiple objections to the initial PSR. A number of the Defendant's challenges were either incorporated into the final PSR or resulted in non-substantive changes. However, several of Defendant's objections were rejected by the probation officer who authored the PSR. The unresolved areas of dispute involve both the offense level and the Defendant's criminal history.

### 1.   Offense level.

The Defendant objects to the BOL of 24. U.S.S.G. §2K1.4(a)(1) allows this BOL only in limited circumstances. Specifically, as it applies to this case, U.S.S.G. §2K1.4(a)(1)(B) requires the structure involved in the arson attempt to be:

> …a dwelling, or (ii) an airport, an aircraft, a mass transportation facility, a mass transportation vehicle, a maritime facility, a vessel, or a vessel's cargo, a public transportation system, a state or government facility, an infrastructure facility, or a place of public use.

Plainly, the Target Headquarters building was neither a dwelling, an airport nor a mass transportation facility. It would also not seem to be a traditional "place of public use" such as arena, auditorium or similar public gathering place.

The application notes for this sentencing guideline refer to 18 U.S.C. §2332 f(e) as a definitional reference for "a place of public use." This statute is part of Ch. 113B establishing penalties for terrorism related offenses. In particular, 18 U.S.C. §2332 f(e)(6) provides:

> 'Place of public use' means those parts of any building, land, street, waterway or other locations that are accessible or open to members of the public, whether continuously, periodically or occasionally and encompasses any commercial buildings, cultural,

---

[3] This conviction is also subject to a five-year minimum term of imprisonment. *(PSR, ¶136, see 18 U.S.C. §844(i).*

> historical, educational, religious, governmental, entertainment, recreational or similar
> place that is so accessible or open to the public.

This definition, once again, suggests a public gathering place where diverse persons congregate, not an office building with restricted access to the public. The "parts" of the Target Headquarters involved in this indictment were a mailroom and adjacent area. No evidence was submitted at trial indicating these areas were open to the public at any time. Indeed, the evidence, scant as it was, suggested these were locations intended to be used only by Target employees—not open to the public.

Moreover, at the time of this incident, August 2020, the Target Headquarters building was open and accessible neither to members of the public, nor to its own employees. Beginning in March 2020, Minnesota Governor Tim Walz declared a public emergency due to the covid-19 pandemic and then issued a series of executive orders taking unprecedented control over social and business activities throughout Minnesota. Of particular importance, on May 1, 2020, Governor Walz issued Executive Order 20-48 extending and modifying a previously issued "stay at home" order. Executive Order 20-48, paragraph 6, required *all* non-critical workers to work from home (emphasis supplied). On May 27, 2020, Executive Order 20-63, paragraph 7.a. continued to prohibit a return to work for all except a relatively small number of critical care workers holding medical care, public service or retail positions. None of the critical sector employees identified in executive Order 20-63 appear to include Target Headquarters' staff. (See *Glenn P. Bruder Declaration, Exh. 1 and 2).*

Governor Walz continued to issue executive orders throughout the summer. In June 2020, Governor Walz issued Executive Order 20-74. Paragraph 7.a. continued to direct that "any worker who can work from home must do so." Paragraph 7.b. established stringent criteria for employers who believed their workers must return to an in-person work environment. (See *Glenn*

6

*P. Bruder Declaration, Exh. 3).* These criteria made it exceedingly difficult for employers to command that workers return to an in-person work environment. Executive Order 20-74 remained in effect on August 26, 2020. As a consequence, the Target Headquarters building was essentially abandoned and unoccupied by anyone, employee or non-employee, on August 26, 2020. Indeed, it was not until September 20, 2021, over one year later, that Target opened their headquarters to *any* employee. Even then, the only areas of the facility which were accessible to employees were cafeterias and conference rooms. Work spaces were still closed, at least until the end of 2021. (See *Glenn P. Bruder Declaration, Exh. 4).*

Because the Target Headquarters was never a place of public use or, if it was, ceased to be as a result of government edicts and Target corporate practices, the BOL specified in U.S.S.G. §2K1.4(a)(1)(B) does not apply to this offense. Instead, the BOL in this case is controlled by U.S.S.G. §2K1.4(a)(2) which sets a BOL of 20.

The Defendant also objects to the proposed two-level adjustment for obstruction of justice under U.S.S.G. §3C1.1. *(PSR, ¶33, 42).* The Defendant concedes that violation of a pretrial release condition can justify a two-level enhancement for obstruction of justice. See *Hayes v. United States, 281 F.3d 724, 725 (8th Cir. 2002).* However, the violation of a pretrial release condition, including absconding, does not necessarily mandate application of this enhancement in every case. Instead, a District Court is expected to apply a "totality of the circumstances" test in determining whether a defendant's behavior justifies this particular enhancement. Conduct which might otherwise warrant application of the two-level obstruction enhancement in a typical case may be overlooked if there are "unusual or compelling circumstances that might justify his actions." *United States v. Soltero, 146 Fed. Appx. 69, 71 (8th Cir. 2005).* The Defendant contends the Court should not apply the two-level enhancement

because the Defendant's actions were undertaken due to his compelling wish to visit a critically ill family member who later died. *(PSR, ¶35)*. Admittedly, Williams did not immediately surrender after doing so, but this was not the result of willful conduct but, rather, Williams' lack of information about ways in which the Defendant might possibly ameliorate his violation.

The PSR also asserts that Williams' post-indictment encounter with Henning at a Target retail facility presents an alternative basis for an obstruction of justice enhancement. *(PSR, ¶33)*.[4] U.S.S.G. §3C1.1 permits this enhancement only for behavior in which the defendant "willfully obstructed" the administration of justice. Henning's own testimony made it clear that her encounter with Williams was unplanned. Williams could not have known when Henning would be scheduled to work that day, she was not visible to Williams when he entered the Target store and, according to Henning, it was only when she walked out onto a balcony to observe Williams that he noticed her in the store. Henning did not relate any overt or even implicit threats directed at her by Williams—merely an expression of dissatisfaction that Henning had accused him of arson. The encounter, which is disputed by Williams, was disturbing to Henning and William's statements, as recited by Henning, were offensive. However, Williams' actions were plainly impulsive and not intended to unduly influence a witness. While the PSR claims Williams' remarks "could be construed as unlawfully influencing or attempting to influence a witness…" *Id.*, this interpretation was rejected by the Court at trial when the Court denied the government's request for a witness tampering instruction.

---

[4] The Defendant has a substantial number of personal concerns in relation to the language in paragraph 33 and the structure of the PSR itself. At the outset, Williams believes the probation officer's use of the phrase "escape from custody" to describe his hospital visit with Beamon is both inaccurate and intended to produce a higher BOP security classification. Williams feels a May 6, 2021 Order (Dkt. 113) effectively released him from custody to permit his transfer to the MNTC long-term treatment program. Similarly, Williams contends the PSR should consistently refer to his conviction as "attempted arson" rather than simply "arson." The Defendant noted that, even at trial, the government agreed there was no completed arson, merely an attempt, and the PSR should reflect this reality.

2.      **Defendant's criminal history.**

The Defendant is convinced that at least half of the criminal history points assigned in the PSR are inappropriately calculated. With one exception, the Defendant's personal beliefs, while sincerely held, are not legally supported.[5] Nonetheless, although the Defendant's legal reasoning is suspect, his sense of fairness is not misguided. The PSR assigned Defendant four criminal history points as the result of two guilty pleas Williams entered in state court on January 15, 2014. *(PSR, ¶67, 68).*[6]

A transcript of the January 15, 2014 court appearance reveals the unique circumstances underlying Williams' guilty pleas. At the conclusion of an unrelated criminal trial in which Williams was determined to be not guilty, it was noted that Williams had also been held on three other misdemeanor charges, each involving a relatively minor offense. Because Williams had already served more than 90 days in jail while awaiting trial, he could not, as a practical matter, be required to serve any additional time. It was likely that each charge would be dismissed when Williams was brought to court. Given the timing of Williams' acquittal, none of the local prosecutors were available to quickly address these issues. The District Court Judge, as an accommodation to Williams, offered to accept guilty pleas to the offense(s), imposed maximum

---

[5] The PSR assigned Defendant a single point for a petty misdemeanor theft conviction occurring on March 16, 2011. The PSR asserted this is appropriate under U.S.S.G. §4A1.1(c) which directs the Court to "add one point for each prior sentence not counted" in U.S.S.G. §4A1.1(a) or (b). Because U.S.S.G. §4A1.2(a)(1) defines "prior sentence" as "any sentence previously imposed upon adjudication of guilt…" this would encompass a variety of stayed sentences. However, that is not the case in the 2011 theft offense described in ¶58 of the PSR. The Defendant was merely fined. A fine is not a sentence. The Defendant was not placed on probation and did not remain under any type of court supervision. Moreover, pursuant to Minn. Stat. §609.02 subd. 4(a), a petty misdemeanor is *not* a criminal violation under Minnesota law. It is, instead, equivalent to a parking ticket punishable only by a fine and should not result in a criminal history point. Candidly, there is little point belaboring this issue because even if this point were deducted from the Defendant's criminal history score, it could be replaced by another single point offense which, as noted in the PSR was not counted under U.S.S.G. §4A1.1(c). *(PSR, ¶76).*

[6] The Defendant actually plead guilty to three offenses on January 15, 2014 but one offense, lurking, was an ordinance violation and, consequently, did not receive a criminal history point. *(PSR, ¶66).*

sentences of 90 days in jail, but credited Williams for time served. These resolutions, orchestrated in the prosecutor's absence, assured Williams' immediate release. (See *Glenn P. Bruder Declaration, Exh. 5)*.

Not surprisingly, Williams leapt at the opportunity to regain his freedom with no apparent sanction. The potential impact of this arrangement, in a federal prosecution nearly a decade later, was never considered. As the Defendant now realizes, these convictions, which he considered to be meaningless at the time, had a significant effect on his criminal history category. Fortunately, U.S.S.G. §4A1.3(b)(1) gives the Court an opportunity to ameliorate the unanticipated and unfair consequences of these pleas. This provision provides:

> If reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, a downward departure may be warranted.

If these offenses were removed from Defendant's criminal history calculation, his criminal history score would be reduced to nine, placing him in category IV. This seems to be a more reasonable classification for the Defendant. While Williams, admittedly, has a host of criminal convictions, none involve serious violence, felony drug offenses, firearms crimes or conduct inherently threatening to others. Most of Williams' convictions were for traffic offenses, petty theft or antisocial behavior. These crimes may be annoying and disrupt social order, but they are not the types of behavior which makes an individual a danger to his or her fellow citizens. In this situation, moving Defendant from category VI to IV will far better reflect his past criminal behavior.

### 3.    Possible effect of the Defendant's objections on his guideline sentence.

If the Court adopts each of the objections and/or departure motion sought by Williams, the effect will be to reduce the total offense level to 20 and apply criminal history category IV.

This would result in a guideline sentence of 51-63 months. If the Court, instead, determines that the BOL is 20 but that a two-point enhancement is appropriate, then Williams total offense level would be 22 and, if placed in category IV, Williams' guideline sentence would be 63-78 months. If the Court retains a total offense level of 26 but places Williams in criminal history category IV, his guideline sentence would be 92-115 months.

## II.    APPLICATION OF FACTORS SET FORTH IN 18 U.S.C. §3553

While this Court is required to properly calculate Williams' guideline sentence, the Defendant's punishment must be framed according to the factors set forth in 18 U.S.C. §3553(a). "The guidelines, while important, are not mandatory. They are simply advisory." *Booker v. United States, 543 U.S. 220 (2005).* Further, "the guidelines are not only not mandatory on sentencing courts, they are not to be presumed reasonable." *Nelson v. United States, 555 U.S. 350, 352 (2009).* Variances from the guidelines are not deemed unreasonable simply because they undercut the guideline range. *Gall v. United States, 552 U.S. 2d 38 (2007).* In determining what is a fair and reasonable sentence, the guidelines serve as a starting point as the sentencing Court analyzes the factors set forth in 18 U.S.C. §3553 (a). *Rita v. United States, 551 U.S. 338 (2007).*

The guideposts for this Court in determining an appropriate sentence are set forth in 18 U.S.C. §3553(a):

The Court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The Court in determining the particular sentence to be imposed shall consider—

(1) The nature and circumstances of the offense and this history and characteristics of the defendant;

(2) The need for the sentence imposed—

(A) To reflect the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense;

(B) To afford adequate deterrence to criminal conduct;

(C) To protect the public from further crimes of the defendant; and

(D) To provide the defendant with needed education or vocational training, medical care or other correctional treatment in the most effective manner

…

## A.    The nature and circumstances of the offense, and the history and characteristics of the Defendant.

Under 18 U.S.C. §3553(a)(1), the Court must consider both the circumstances of the offense for which the Defendant has been convicted along with the Defendant's background and personal characteristics. The Defendant professed his innocence at trial and a jury convicted him. While the Defendant sincerely believed himself to be not-guilty he must, for the purpose of this sentencing, acquiesce to the jury's decision. The Defendant understands this requires the Court to evaluate sentencing issues in a manner which acknowledges the jury's verdict and by viewing the evidence presented in that same light. Attempting to set a building ablaze is invariably a serious offense due to the risks inherent in the underlying criminal activity. Nonetheless, Williams' conduct pales in comparison to that of his co-defendants.

Jackson and Edwards used flammable material and accelerants to set a fire which caused nearly $1 million in damage to the Target Headquarters.[7] In contrast, Williams stumbled drunkenly about the sidewalk outside the Target Headquarters building, moved into a stone and glass entryway and unsuccessfully tried to light a piece of cardboard on fire.[8] He did not employ

---

[7] Jackson received a sentence of 33 months. Edwards received a sentence of 100 months.

[8] Williams disputes the PSR's claim that he placed "lit cardboard and other combustibles" in the Target Headquarters entryway. *(PSR, ¶24).*

any accelerant and never caused any material, at all, to burn. The consequences of Williams' efforts were so minor, they were not even noticed by Target security personnel or fire inspectors until sometime later when they watched video recordings of the building's entryway from Target security cameras.

Sadly, these events also speak to Williams' history and character. Assessing the evidence presented most favorably to the government, the U.S. Attorney proved that Williams spent the evening of August 26, 2020 wandering about downtown Minneapolis, stealing and abusing alcohol, impulsively looting a building when the opportunity arose, and then bumbled about the Target Headquarters entryway in a drunken state, trying, but apparently incapable, of starting a fire. A review of the Defendant's criminal history, as expressed in the PSR, reveals this conduct to be far from atypical. During his adult lifetime, the Defendant has been convicted for a host of petty offenses, typically spurred by financial need, addiction or impulsive conduct.

In isolation, this behavior might warrant scorn and condemnation. However, the PSR affords the Court a more complete picture of the Defendant's history and allows the Court to tailor a sentence for Williams which takes his individual circumstances and needs into consideration Virtually from birth, Williams has been failed by his family and society. Williams apparently had no relationship with his father. *(PSR, ¶99).* Williams' mother was a crack user who was routinely impaired. *(PSR, ¶103).* Shortly after Williams' birth, his mother became involved with Monte Bledsoe ("Bledsoe"). *(PSR, ¶100).* The Defendant described Bledsoe as "terrifying." Bledsoe repeatedly abused the Defendant's mother in Williams' presence and, in a horrifying incident occurring when he was 11, Williams watched Bledsoe rape his mother after binding her hands together. *(PSR, ¶101).* Bledsoe terrorized Williams and his younger brother, physically assaulting them for minor transgressions. *(PSR, ¶101).*

At some point, Bledsoe went to prison which Williams claimed "saved his life." *(PSR, ¶101)*. While Bledsoe's imprisonment may have created a "safer" situation for Williams, the improvement was only a matter of degree. Williams and his mother remained on Chicago's southside where he was daily "exposed to deaths, drugs and gang violence…" *(PSR, ¶101)*. By age 7, Williams witnessed his first murder. *(PSR, ¶101)*.

Williams' mother eventually fled to Kansas City seeking a new life for her and her children. *(PSR, ¶102)*. However, her addiction led to Williams and his brother being placed in foster care while in Kansas City. *(PSR, ¶103)*. Eventually, Williams' mother regained custody, but this was hardly a happy homecoming. Willimas recounted his mother pulling his hair, hitting him and stealing from him. *(PSR, ¶104)*. His mother's drug use also remained problematic and Williams recalled local gang members threatening to kill her due to drug debts. In one instance, Williams, although still a teen, attempted to pay off his mother's drug debt to the local gang members. *(PSR, ¶104)*. Williams' family moved, again, to Minnesota, in 2002. *(PSR, ¶106)*. This led to a cycle of homelessness or living in local shelters. *(PSR, ¶106)*. Police were regular visitors to Williams' home. These events, coupled with his mother's interpretation of them, led Williams to perceive the police as harassers and invaders, rather than persons attempting to safeguard Williams and his family. By 2005, Williams was on his own and essentially homeless. According to the PSR, "he slept in parks, in fast food restaurant bathrooms, libraries, stores, on trains, porches, various shelters throughout Minneapolis…" *(PSR, ¶107)*.

Not surprisingly, Williams began using drugs and alcohol during his adolescence to escape his bleak experiences. *(PSR, ¶107)*. Williams first experimented with marijuana at age 11 and continued to smoke it regularly throughout his teens. *(PSR, ¶120)*. As a young adult, Williams began consuming alcohol and soon grew to be addicted to it as a means of coping with

14

his situation. *(PSR, ¶120).* Williams also experimented with methamphetamine, cocaine and Xanax. *(PSR, ¶120).* While on pretrial release and in treatment, there is evidence that Williams continued to use drugs and alcohol. *(PSR, ¶120).*

Aside from periods in Kansas City, there is no evidence that Williams' father, grandparents, older family members, law enforcement, social workers, teachers, school counselors or others meaningfully interceded to rescue Williams and his brother from these deplorable circumstances. Despite these challenges and lack of any measurable support, Williams managed to graduate from high school in 2007 *(PSR, ¶126)* and attended Minneapolis Community and Technical College through 2009. *(PSR, ¶127).* Williams also began a relationship with Dorothy Hill ("Hill") which continued episodically until 2020. Williams and Hill are the parents of two children, a 13-year-old daughter and a 9-year-old son. *(PSR, ¶108).* Williams has sought, to the extent possible, to maintain contact and to sustain a relationship with his children. While in custody, Williams employed his time productively, earning numerous certificates demonstrating completion of various educational or self-improvement classes. (See *Glenn P. Bruder Declaration, Exh. 6).*

This background is meaningful in a number of respects. Most importantly, it reveals that Williams is largely a product of his experiences. Denied a supportive home environment, he was exposed to drugs and violence at an early age. There was no one in his orbit of friends, family or the community who showed an interest in safeguarding Williams as the family descended into homelessness and Williams found himself on the streets as a teenager. It is hardly surprising that by 2020, Williams was adrift, with an erratic work history and, apparently, pursuing a life of petty crime and antisocial behavior. The marked absence of any meaningful intervention by social welfare advocates is an indication that Williams' failings are less due to any intrinsic

15

character flaw than to a society which seemed to have no interest in his wellbeing. To his credit, Williams sought to have a relationship with his children and had some educational success despite the total absence of family role models.

       **2.**      **Justice and rehabilitation factors.**

18 U.S.C. §3553(a)(2) requires the Court to tailor a sentence which considers Williams' background and needs while simultaneously providing deterrence and safeguarding the public. The PSR rightly notes that Williams will benefit from substance abuse and mental health counseling in prison. Accordingly, the Defendant requests the Court recommend him for participation in the Residential Drug Abuse Program (RDAP) while in prison. Unfortunately, the PSR too harshly criticizes Williams by stating that his "criminal history shows a demonstrable lack of respect for the law…" and "Williams' previous sentences which include shorter jail terms or stayed terms of incarceration and probation have not resulted in meaningful change to his behavior." *(PSR, ¶155).*

These statements, on some level, may be true. Williams' criminal history includes at least 23 adult criminal convictions *(PSR, ¶52-74)* and numerous traffic offenses. If there had ever been a legitimate effort by local officials to intercede and break Williams' cycle of petty crime and antisocial behavior, the criticisms leveled in the PSR might be fair. However, what is noteworthy in the criminal history chronicled in Williams' PSR is the lack of any meaningful effort by state officials to *either* punish or rehabilitate Williams. Instead, time after time, Williams, after being held in jail for a relatively short period, would appear in court, quickly plead guilty and be released without any effort to address the cause of Williams' behavior. Until the Defendant's indictment here, his record is bereft of any effort to assess his chemical dependency or mental health needs or even to confine him in a custodial setting where he might

16

have received some type of structure and education. After 20 years, this sentencing represents the first time that Williams will be placed in a custodial environment where any of these rehabilitative options will be available to him.

Accordingly, this does not call for a guideline sentence approaching or exceeding a decade in prison. A sentence of that duration is not only grossly disproportionate compared to the sentences meted out to Williams' co-defendants, but it is also so harshly punitive that it would simply reinforce the Defendant's belief that he is being persecuted. Instead, a 60-month sentence, reflecting the statutory mandatory minimum term of imprisonment, will afford the Defendant a significant sanction while simultaneously providing him with adequate opportunity to address his addiction disorder and begin grappling with the circumstances of his upbringing. This sentence, while significant, and recognizing the serious nature of Defendant's conduct, will not, however, be so lengthy that it will deprive Williams of an opportunity to reenter society or to maintain and sustain a relationship with his children.[9]

## CONCLUSION

For the above stated reasons, the Defendant respectfully requests the Court impose a prison term of 60 months.

Dated: January 18, 2024

Respectfully submitted,

MITCHELL, BRUDER & JOHNSON
*/s/ Glenn P. Bruder*
Attorney for Defendant
9531 West 78th Street
Suite 210
Eden Prairie, MN 55344
(952) 831-3174

---

[9] The Defendant respectfully requests the Court recommend that he be confined at an appropriate facility in Minnesota, or as close to Minnesota as practicable.